**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BERNARD VICTOR MISZLER,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **3:04-CV-1756** |
| | : | **(JUDGE VANASKIE)** |
| **JEFFREY SHOEMAKER, ET AL.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Plaintiff Bernard Victor Miszler commenced this litigation under 42 U.S.C. § 1983

alleging violations of the Eighth Amendment in connection with his confinement at the

Susquehanna County Correctional Facility ("SCCF").  As an inmate at SCCF, Mr. Miszler

participated in the work release program.  On August 20, 2002, he was injured in the course of

his employment and was treated at a hospital in Scranton, Pennsylvania.  Following his

discharge from the hospital and return to SCCF, Mr. Miszler claims he was denied adequate

medical care.  Mr. Miszler names as Defendants Jeffrey J. Shoemaker, Chief Probation Officer

for Susquehanna County; Sheri Chapel, Probation Officer for Susquehanna County; William

Brennan, Warden of SCCF; Charles J. Aliano, Lance Benedict, Robert Calvin Dean, Gary

Marcho, and Lee Smith, members of the Susquehanna County Prison Board ("the Board

Members"); and Susquehanna County.[1]

---

[1]Based upon Mr. Miszler's Complaint and his brief in opposition to Defendants' summary
judgment motion, it appears that the individual Defendants are sued in both individual and

Before the Court is Defendants' Motion for Summary Judgment.  (Dkt. Entry 13.)  This

Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).  As will be explained

below, there are genuine issues of fact material to whether Warden Brennan acted, or refused

to act, with deliberate indifference to Mr. Miszler's serious medical needs.  Consequently,

summary judgment will be denied as to Warden Brennan.  In all other respects, Defendants'

motion will be granted.

## I. BACKGROUND

### A. Factual Background

Some time prior to August 20, 2002, Mr. Miszler was sentenced to a term of

imprisonment of eleven months, to be served at SCCF.  (Defs.' Statement of Undisputed Facts

("SUF - Defs."), Dkt. Entry 14-2, ¶¶ 1-2.)  As part of his plea bargain, Mr. Miszler was granted

immediate participation in the work release program.  (Miszler Dep., Jan. 12, 2005, Dkt. Entry

16, at 8:5-8.)  As a participant in the work release program, Mr. Miszler was allowed to leave

the prison for a period of twelve hours per day, six days per week, in order to maintain his

employment with Alkaz Construction ("Alkaz").  (Id. at 9:12-14; SUF - Defs. ¶ 3.)

On August 20, 2002, Mr. Miszler was at an Alkaz job site working to construct a log

cabin home.  (SUF - Defs. ¶ 4.)  Besides Mr. Miszler, the only other individual present was Al

Kazmierski, the owner of Alkaz.  (Miszler Dep. 10:13-14.)  Mr. Miszler was injured when a log

official capacities.

2

stationed on a scaffold rolled off and struck him across his lower body.  (Id. at 8:20-24; see also Discharge Summary, Ex. A. to Defs.' Reply Br., Dkt. Entry 24-2.)

Mr. Kazmierski transported Mr. Miszler to the Community Medical Center ("CMC") in Scranton, Pennsylvania.  (SUF - Defs. ¶ 7.)  There, X-rays revealed a "supracondylar fracture of the right distal femur."  (Discharge Summary.)  Mr. Miszler's treating physician, Dr. Chiavacci, performed a surgical procedure known as an "open reduction" that involved the insertion of a "retrograde rod."  (Id.)  Dr. Chiavacci also repaired a torn right quadriceps muscle. (Id.)

After Mr. Miszler arrived at CMC, he contacted his probation officer, Ms. Chapel, to apprise her of his misfortune.  (Miszler Dep. 9:17-18, 10:20-25.)  In light of Mr. Miszler's accident and hospitalization, the Court of Common Pleas for Susquehanna County issued an Order on August 20, 2002, placing Mr. Miszler on medical furlough until his release from CMC. (Ex. 1 to Miszler Dep., Dkt. Entry 16.)  The Order further provided that Mr. Miszler's failure to return to SCCF upon his release would be deemed an escape.  (Id.)  Mr. Miszler denied that he was aware of the state court's August 20 Order while he was at CMC.  (Miszler Dep. 11:11-20.)

Mr. Miszler was discharged from CMC on August 27, 2002, and returned to SCCF that morning.  (SUF - Defs. ¶¶ 10-11.)  In connection with his discharge, Mr. Miszler contends that Dr. Chiavacci referred him to Allied Services for rehabilitation.  However, he did not go to Allied Services because he was told by Ms. Chapel that he must return to SCCF, and that his failure

3

to return to SCCF would constitute an escape.  (Miszler Dep. 11:24-12:5.)  Besides Mr.

Miszler's contention, there is nothing in the record documenting Dr. Chiavacci's alleged referral

to Allied Services, nor is there any evidence that Dr. Chiavacci communicated this instruction to

Allied Service, Ms. Chapel or any other SCCF employee.

On the other hand, the discharge instructions provided to – and signed by – Mr. Miszler

on August 27 do not prescribe any rehabilitation or other physical therapy program at Allied

Services or otherwise.  (CMC Discharge Instructions, Ex. B to Defs.' Reply Br., Dkt. Entry 24-

2.)  Moreover, according to a discharge summary from CMC's Rehabilitation Department, Mr.

Miszler attended five therapy sessions while at CMC, and demonstrated "improvement in level

of functioning, independence or quality of life."  The record further indicates that he was

discharged from therapy on August 26, 2002, because "[a]ll goals established by patient or

therapists were achieved."  (CMC Discharge Summary – Rehabilitation Dep't, Ex. C to Defs.'

Reply Br., Dkt. Entry 24-2.)

At the time of his discharge, Mr. Miszler was given prescriptions by Dr. Chiavacci for

three medications: Percocet, Lovenox, and Keflex, which is a brand name for Cephalexin, an

antibiotic.[2]  (See Discharge Instructions.)  Specifically, Dr. Chiavacci prescribed 500 mg

capsules of Cephalexin, to be ingested four times a day, and 40 mg prefilled syringes of

Lovenox, to be injected subcutaneously once per day.  (Id.; see also Exs. A-B to Alice Miszler

---

[2]See Cephalexin, http://www.drugs.com/cephalexin.html (last visited June 1, 2007).

Aff., Dkt. Entry 22 (receipts from CVS pharmacy).)  Mr. Miszler was driven to SCCF by his wife, Alice, and their intent was to stop at a pharmacy on the way to have the prescriptions filled. However, Ms. Chapel advised Mrs. Miszler that she should not stop at a pharmacy because Mr. Miszler would not be permitted to bring the prescription medications into SCCF.  (Alice Miszler Aff., Dkt. Entry 22, ¶ 10.)  Instead, Mrs. Miszler was instructed to bring the prescription forms to SCCF so they could be filled by an SCCF employee.  (Id.)

When the Miszlers arrived at SCCF, they were greeted by Warden Brennan, who received the prescription forms from Mrs. Miszler as her husband entered SCCF.  (Id. ¶ 11.) The record does not disclose what, if anything, Warden Brennan did with the prescription forms after they were given to him.  It is clear, however, that the prescriptions for Cephalexin and Lovenox were not filled by Warden Brennan or anyone else because the original forms were returned to Mrs. Miszler when her husband was released from SCCF.  (Id. ¶ 18.)

Mr. Miszler was confined at SCCF from August 27 to August 29.  He testified that he did not receive any of the prescribed doses of Cephalexin and Lovenox.  (Miszler Dep. 16:20-21,18:11-21.)  He also did not receive the Percocet, except for one dose given to him at approximately 4:00 p.m. on August 28.  (Id. at 17:8-10.)   Additionally, on August 28, Mrs. Miszler contacted SCCF to ascertain the status of her husband's medications.  She was told that "it takes a while [sic] to get medication in Jail," suggesting that Mr. Miszler was not given any medications prior to this conversation and that none would forthcoming in the immediate

future.  (Alice Miszler Aff. ¶ 14.)

Defendants point to evidence in the record indicating that Mr. Miszler's prescription medications were administered to him, at least with respect to the Percocet and Cephalexin.  A Medication Administration Record purports to show that Mr. Miszler received Cephalexin at 1700 hours on August 27; at 2100 hours on August 27; at 0630 hours on August 28; at 1700 hours on August 28; at 2100 hours on August 28; and at 0630 hours on August 29. (Medication Administration Record, Ex. 3 to Miszler Dep., Dkt. Entry 16.)  Each administration is initialed by, presumably, an SCCF employee, though the identities are unknown.  (Id.) Neither Mr. Miszler's name nor SCCF's name appear on the record, although there is a notation "Left Jail @ 8-29-02 12:18," which is the approximate time that Mr. Miszler left SCCF on August 29.  (Id.; see Miszler Dep. 16:22-24.)  Defendants also refer to an untitled document purporting to show that Mr. Miszler received five doses of Roxicet, which is a brand name for Percocet, from August 28 to August 29.[3]  (Medication Record, Ex. 4 to Miszler Dep., Dkt. Entry 16.) Unlike the Medication Administration Record, Mr. Miszler's name appears on this record, albeit incorrectly.  Finally, Diane Barron, an SCCF corrections officer, testified that SCCF had Cephalexin onsite in its pharmaceutical stock room, and that Mr. Miszler's prescription for Percocet was filled at a nearby pharmacy.  (Barron Dep., Nov. 3, 2005, Dkt. Entry 22, 12:3-9, 12:13-13:11.)  On one occasion, she may have gone to the stock room herself to obtain

---

[3]See Percocet, http://www.drugs.com/percocet.html (last visited on June 1, 2007).

Cephalexin for Mr. Miszler.  (Id. at 13:7-11, 13:16-21.)  However, she did not testify that she

personally administered Cephalexin or any other medication to Mr. Miszler, or that she

witnessed any SCCF employee give medication to Mr. Miszler.[4]

On August 29, 2002, Mr. Miszler was granted a medical furlough by the Court of

Corrections Officer Barron also explained why Mr. Miszler would not have received any

injections of Lovenox while he was confined at SCCF.  SCCF personnel are not qualified to

administer injection medications to inmates.  (Id. at 23:14-17.)  Injection medications are only

administered if the inmate is capable of administering the medication himself, such as a

diabetic.  (Id. at 24:2-4.)  Since Mr. Miszler was not trained to self-inject the Lovenox, he could

not receive this medication while at SCCF.

On August 29, 2002, Mr. Miszler was granted a medical furlough by the Court of

Common Pleas for Susquehanna County until September 11, 2002.[5]  (Order of Court of Aug.

---

[4]Corrections Officer Barron also explained that SCCF obtains medications from
Diamond Pharmacy Services ("Diamond"), which is located in Indiana, Pennsylvania.  (Barron
Dep. 22:9, 15-17.)  According to Ms. Barron, the procedure is fairly simple.  A doctor will
complete a prescription form, and an SCCF employee affixes to the form a sticker stating "Refill
99 Times" or something to that effect.  (Id. at 22:25-23:1-3.)  The form is faxed to Diamond, and
the medications are delivered the next day by Federal Express.  (Id. at 23:3-4.)  It appears that
SCCF utilizes Diamond to obtain medications for its pharmaceutical stock room.  Whether
SCCF fills individual prisoner prescriptions with Diamond is not clear from the record, given
Corrections Officer Barron's testimony that Mr. Miszler's prescription for Percocet was filled at a
local pharmacy.  Plaintiffs have produced evidence indicating that Diamond has no record of
any prescription medications ordered on behalf of Mr. Miszler.  (See Correspondence from
Diamond to Attorney Phillips, Nov. 30, 2005, Dkt. Entry 22.)

[5]On September 11, 2002, the state court extended Mr. Miszler's medical furlough
indefinitely and allowed him to serve his sentence under house arrest, with electronic
monitoring, until he was fully recovered and/or SCCF was capable of accommodating his

29, 2002, Ex. 2 to Miszler Dep., Dkt. Entry 16.)  Mr. Miszler's right leg had swelled and he

exhibited other symptoms.  (Alice Miszler Aff. ¶ 19.)  According to Mrs. Miszler, Warden

Brennan told her at the time of her husband's release that SCCF did not want "responsibility"

for Mr. Miszler due to his condition.  (Id.)  Additionally, Warden Brennan returned Mr. Miszler's

original prescription forms for Cephalexin and Lovenox without an explanation as to why neither

prescription had been filled.  (Id. ¶ 18.)  On their way home from SCCF, the Miszlers stopped to

see Mr. Miszler's daughter, who obtained the medications at a nearby CVS pharmacy.  (Id. ¶¶

20-21; Miszler Dep. 19:7-20:11.)

Subsequent to his release from SCCF, Dr. Chiavacci discovered that Mr. Miszler's

wound had become infected.  Mr. Miszler's expert, P. Christopher Metzger M.D., reviewed Mr.

Miszler's medical records and summarized those records in his expert report.  Mr. Miszler had

a follow-up visit with Dr. Chiavacci on September 3, 2002.  (Miszler Dep. 20:17-23; Expert

Report of P. Christopher Metzger, M.D. ("Metzger Report"), Ex. E to Defs.' Reply Br., Dkt. Entry

24-2, at 1.)  Mr. Miszler was "doing well" at the time, the "wound looked good," and

roentgenograms taken during the visit displayed the fracture in satisfactory alignment with the

"internal fixation device in the expected position."[6]  (Metzger Report, at 1.)  Mr. Miszler was next

---

medical needs.  (Order of Court of Sept. 11, 2002, Ex. 5 to Miszler Dep., Dkt. Entry 16.)  Mr.
Miszler was subsequently reincarcerated for violating the terms and conditions of his electronic
monitoring.  (See Order of Court of Dec. 31, 2002, Ex. 6 to Miszler Dep., Dkt. Entry 16.)

[6]Mr. Miszler testified that the infection was discovered at this appointment, and that
blood tests were ordered.  (Miszler Dep. 21:1-3.)

seen on September 13, 2002.  Dr. Chiavacci discovered an infection had developed around the wound, at which point "antibiotics were once again started."  (Id.)  Another visit occurred three days later, the medical records noting drainage from the surgical incision.  (Id.)  On October 7, 2002, Mr. Miszler was readmitted to CMC, where he was "taken to the operating room [and] underwent debridement of the right thigh wound, thorough irrigation, and the placement of a 'wound vac.'"  (Id.)  Mr. Miszler was subsequently evaluated by Dr. Chiavacci on several occasions.  Dr. Chiavacci noted that Mr. Miszler's fracture was healing and that he exhibited adequate range of motion.  (Id.)  He also concluded, however, that Mr. Miszler had sustained a loss of quadriceps strength, and that "a partial disability was present, as well as a residual cosmetic deformity."  (Id.)

In addition to Dr. Chiavacci, Mr. Miszler was treated by Dr. Gregory Bormes, a plastic surgeon.  (Id. at 2.)  On November 18, 2002, a skin graft was placed over the infected area. (Id.)  The skin graft eventually healed, but Dr. Bormes also opined that the disfigurement of the right thigh area was permanent, and he noted the presence of muscle weakness.  (Id.)

After reviewing Mr. Miszler's medical records, and assuming that Mr. Miszler had not received the Cephalexin prescribed by Dr. Chiavacci for several days after his return to SCCF on August 27, Dr. Metzger opined that "withholding these antibiotics could certainly have been deleterious to his wound."  (Id.)  Dr. Metzger stated in his report that "crush injuries [like Mr. Miszler's] are more prone to infection, particularly when an open reduction with internal fixation

9

has taken place." (Id.)  The deep wound infection that developed necessitated additional "surgical intervention," including the debridements and the skin graft.  (Id.)  Dr. Metzger concluded that proper administration of Mr. Miszler's antibiotics while at SCCF "would have minimized the likelihood of a deep wound infection developing.  Had the wound infection not developed, subsequent surgery would not have been necessary, and his post injury residual would have been less."  (Id.)

### B. Procedural History

On or about August 9, 2004, Mr. Miszler filed a Complaint in this Court alleging violations of the Eighth Amendment based upon the denial of medical treatment.  (Dkt. Entry 1.) On September 17, 2004. Defendants filed an Answer denying Mr. Miszler's allegations.  (Dkt. Entry 3.)  The parties engaged in discovery.  On January 31, 2006, Defendants filed a Motion for Summary Judgment.  (Dkt. Entry 13.)  The motion has been fully briefed by the parties, (Dkt. Entries 14, 21, 24), and therefore is ripe for disposition.

## II. DISCUSSION

### A. Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if proof of its existence or

nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Mere conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment.  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B. Eighth Amendment Claims Against the Individual Defendants

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones."  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).  The Eighth Amendment, applicable to the states through the Due

Process Clause of the Fourteenth Amendment, see, e.g., Wilson v. Seiter, 501 U.S. 294, 296-97 (1991), governs the treatment of an inmate in prison, as well as the conditions of his confinement. Helling v. McKinney, 509 U.S. 25, 31 (1993). The amendment's proscription of "cruel and unusual punishments" not only constrains the conduct of prison officials, but also imposes an affirmative obligation on prison officials to provide the basic essentials of humanity, including adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103 (1976). The failure to provide adequate medical care for a serious medical condition may be actionable in a § 1983 lawsuit. The prisoner must, however, "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106.

In order to establish a violation of a prisoner's Eighth Amendment right to adequate medical care, the prisoner must present evidence showing (1) a serious medical need and (2) acts or omissions by prison officials indicating deliberate indifference to that need. Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003). Defendants have not moved for summary judgment on the ground that Mr. Miszler's fracture, wound infection, and consequent surgical intervention, disability, and disfigurement are not serious medical needs. Rather, Defendants contend that there are no genuine issues of material fact with respect to whether they acted, or failed to act, with deliberate indifference.

Deliberate indifference is a subjective standard of liability comparable to the standard of recklessness employed in the criminal law context. Id. In Farmer, the Supreme Court

explained that a prison official is liable for denying adequate medical care only upon evidence that the official "knows that [an] inmat[e] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." 511 U.S. at 847.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.  While direct evidence of a prison official's knowledge is desirable, it is not essential.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. at 842 (internal citation omitted).

Our Court of Appeals has identified a variety of circumstances where deliberate indifference to serious medical needs may exist:

> (1) where "knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care"; (2) where "[s]hort of absolute denial . . . necessary medical treatment [i]s . . . delayed for non-medical reasons"; (3) where "prison authorities prevent an inmate from receiving recommended treatment"; (4) "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury"; and (5) "where prison officials erect arbitrary and burdensome procedures that result[] in interminable delays and outright denials of medical care to suffering inmates."

Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346-47 (3d Cir. 1987).  This list is not exclusive, but a prisoner must show, at the very least, that the defendant acted in a

manner similar to one of the aforesaid circumstances.  Moreover, to defeat a motion for summary judgment where, as here, the moving party contends the absence of evidence to support a claim, the prisoner "must point to some evidence beyond [his] raw claim that [Defendants were] deliberately indifferent"; he must point to evidence "showing that [Defendants] knew or [were] aware of [the] risk" and chose to disregard it.  Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001).

Additionally, an individual government defendant may be liable in a § 1983 action only if it is shown that he or she had personal involvement in the alleged misconduct; liability in § 1983 actions is not imposed under the theory of respondeat superior.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  In other words, a supervisor or member of a governing board is not, ipso facto, liable for a constitutional violation perpetrated by a subordinate employee.  Instead, the plaintiff must present evidence of personal involvement by the supervisor or board member, which can be shown by evidence "of personal direction or of actual knowledge and acquiescence."  Id.; see also Mabine v. Vaughn, 25 F. Supp. 2d 587, 592 (E.D. Pa. 1998).  A supervisor may also be liable where his or her affirmative promulgation of a policy caused the constitutional violation at issue.  See Davis v. Pa. Dep't of Corr., Civ. A. No. 05-1558, 2006 WL 2927631, at *5 (W.D. Pa. Oct. 12, 2006); Mabine, 25 F. Supp. 2d at 592.

### 1) Warden Brennan

Warden Brennan contends that he is entitled to summary judgment because there is no

evidence the he acted with deliberate indifference to Mr. Miszler's serious medical needs. (Defs.' Supp. Br., Dkt. Entry 14, at 13.)  Mr. Miszler counters that there is evidence in the record supporting an inference of deliberate indifference.  Specifically, Mr. Miszler points to the fact that (1) Warden Brennan received the prescription forms from Mrs. Miszler on August 27, yet returned the original prescription forms, unfilled, to Mrs. Miszler upon her husband's release on August 29; and (2) with one exception, Mr. Miszler denies receiving his prescription medications during his two-day confinement at SCCF.  (Pl.'s Opp'n Br., Dkt. Entry 21, at 9-10.)

Viewing the evidence in the light most favorable to Mr. Miszler and giving him the advantage of all reasonable inferences therefrom, the Court concludes that a triable question exists as to whether Warden Brennan acted with deliberate indifference to Mr. Miszler's serious medical needs.  A defendant who knows of a prisoner's need for prescription medications, yet denies access to those medications, can be found liable in a § 1983 action.  See Natale, 318 F.3d at 582-83; Walker v. Benjamin, 293 F.3d 1030, 1039-40 (7th Cir. 2002); Bosco v. C.F.G. Health Sys., LLC, Civ. A. No. 04-CV-3517 (JEI), 2006 WL 3095973, at *3 (D.N.J. Oct. 25, 2006).  Here, a reasonable jury could conclude that Warden Brennan had knowledge of Mr. Miszler's need for his prescription medications – in particular, the Cephalexin – and intentionally refused to provide the treatment or prevented Mr. Miszler from receiving it.

When the Miszlers arrived at SCCF on August 27, they were greeted by Warden Brennan, who obtained Mr. Miszler's prescription forms from his wife.  A jury may infer that

Warden Brennan knew at that point the serious nature of Mr. Miszler's condition and his need for the medications.  The record does not reveal what, if anything, Warden Brennan did with the prescriptions.  It is undisputed, however, that Warden Brennan returned the original prescription forms to Mrs. Miszler at the time of her husband's release two days later and, at that time, Warden Brennan told Mrs. Miszler that SCCF did not want "responsibility" for her husband.  It was not until Mr. Miszler's release from SCCF on August 29 that he was finally able to fill the prescriptions.  Thus, when considered in light of Mr. Miszler's denial that he received his prescribed medications while at SCCF, a jury could reasonably infer that Warden Brennan consciously denied Mr. Miszler's access to his medication, or otherwise failed to take reasonable measures to ensure the administration of the medications.[7]

Additionally, there is sufficient evidence in the record from which a jury could conclude that Warden Brennan's actions caused Mr. Miszler's injury.  Following his release from SCCF, Dr. Chiavacci discovered that a deep wound infection had developed, which prompted invasive

---

[7]That there is evidence suggesting that the prescription medications were administered to Mr. Miszler – the Medication Administration Record, the untitled Medication Record, and Corrections Officer Barron's deposition testimony – merely confirms the existence of genuine issues of fact.  First, the authenticity of both documents is suspect.  For instance, Mr. Miszler's name is omitted from the Medication Administration Record and spelled incorrectly on the untitled Medication Record.  Furthermore, the Medication Administration Record purports to show that Mr. Miszler was supposed to receive three doses of Cephalexin per day when, in fact, his prescription was for four doses per day.  Second, despite Corrections Officer Barron's testimony regarding the pharmaceutical stock room and that Mr. Miszler's prescription for Percocet was filled at a local pharmacy, there is no testimony that anyone personally administered, or observed someone else administering, Mr. Miszler's prescription medications.  Finally, Warden Brennan has not shown how this evidence is linked to his actions.

16

surgical procedures and resulted in permanent disability and disfigurement.  Dr. Metzger opined that withholding Cephalexin while Mr. Miszler was confined at SCCF was "deleterious" to his wound and contributed to the infection.  Therefore, accepting Mr. Miszler's evidence as true, a jury could reasonably conclude that Warden Brennan's actions in denying Mr. Miszler access to his prescription medications caused his injury.

In summary, there are genuine issues of material fact as to whether Warden Brennan acted with deliberate indifference to Mr. Miszler's serious medical needs.  Therefore, Warden Brennan is not entitled to summary judgment.[8]

---

[8]If his brief, Warden Brennan argues that he is entitled to qualified immunity.  (Defs.' Supp. Br. 12.)  "Qualified immunity shields public officials performing discretionary functions from § 1983 and Fourteenth Amendment liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Abbott v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The qualified immunity inquiry entails two steps.  First, the Court must determine whether Warden Brennan violated a "clearly established" right.  Id.  Second, the Court must determine "whether, in light of the concrete, clearly established, and particular law applicable on [August 27-29, 2002], and the information then available, a reasonable [prison official] would have believed that the conduct of [Warden Brennan] deprived [Mr. Miszler] of his right to [adequate medical care]."  Id.

At the time of relevant events, it was long settled that a prisoner has an Eighth Amendment right to receive adequate medical care.  Therefore, as explained above, a genuine issue of fact exists as to whether Warden Brennan violated a "clearly established" constitutional right.  Moreover, genuine issues of fact exist as to whether a reasonable prison officer would have believed that Warden Brennan's actions violated Mr. Miszler's Eighth Amendment rights. In this regard, Warden Brennan has not submitted an affidavit explaining his actions that would permit an inquiry into the reasonableness of his conduct.  Accordingly, Warden Brennan is not entitled to summary judgment on his claim of qualified immunity.

### 2) Ms. Chapel

Ms. Chapel argues that she is entitled to summary judgment because there is no evidence of her direct knowledge of, or personal participation in, the alleged Eighth Amendment violations.  (Defs.' Supp. Br. 6.)  Mr. Miszler responds that there is sufficient evidence to raise a triable issue as to whether Ms. Chapel acted with deliberate indifference to his serious medical needs.  First, Mr. Miszler argues that Ms. Chapel ordered his return to SCCF upon his discharge from CMC, despite her knowledge that Mr. Miszler was referred to Allied Services for rehabilitation.  (Pl.'s Opp'n Br. 9.)  Second, Mr. Miszler contends that Ms. Chapel prevented him from obtaining his prescription medications.  Ms. Chapel advised Mrs. Miszler not to fill the prescriptions before returning to SCCF because Mr. Miszler would not be permitted to bring the medications into SCCF.  (Id. at 9-10.)  Instead, Ms. Chapel told the Miszlers to bring the prescription forms with them to SCCF, where they would filled by an SCCF employee.  (Id. at 10.)

At the time of his discharge from CMC, Mr. Miszler contends that he told Ms. Chapel that he was to be admitted into Allied Services for rehabilitation.  Ms. Chapel dismissed this and ordered his return to SCCF, even threatening criminal charges if he did not return.  A prison official acts with deliberate indifference to serious medical needs where he or she prevents a prisoner from receiving recommended treatment.   However, there must be proof of the recommendation, such as a documented referral or evidence that the medical professional

recommending the treatment communicated the recommendation to the defendant.  See Miller v. Hoffman, No. Civ. A. 97-7987, 1999 WL 415397, at *3, 6 (E.D. Pa. June 22, 1999); Douglas, 1996 WL 716278, at *2-3, 8 n.11.  Mere allegations by the plaintiff that treatment was recommended, with nothing more, will not suffice to withstand summary adjudication.

Here, beyond Mr. Miszler's bald allegation that Dr. Chiavacci referred him to Allied Services, Mr. Miszler has failed to present any competent evidence of Dr. Chiavacci's alleged referral to Allied Services.  Similarly, there is no evidence that Dr. Chiavacci communicated his referral to Ms. Chapel or any other SCCF employee.  To the contrary, the documents from CMC associated with Mr. Miszler's discharge belie his assertion that further physical therapy was ordered by Dr. Chiavacci.  For instance, the Discharge Instructions, signed by Mr. Miszler, do not even mention the need for physical therapy, much less a referral to Allied Services.  Additionally, the Discharge Summary from the CMC Rehabilitation Department indicates that he was discharged from physical therapy on August 26, 2002, because "[a]ll goals established by patient or therapists were achieved."  Thus, the only competent evidence on the subject does not support Mr. Miszler's contention that Dr. Chiavacci referred him to Allied Services.  Moreover, even accepting Mr. Miszler's assertion that he advised Ms. Chapel of the referral to Allied Services, this alone will not support an inference that Ms. Chapel knew that a substantial risk of serious harm could befall Mr. Miszler if she ordered his return to SCCF.[9]  Therefore, Mr.

---

[9]As noted earlier, the state court's August 20, 2002 Order required Mr. Miszler to return to SCCF upon his release from the hospital.  Although he denies knowledge of this Order at the

Miszler cannot survive summary judgment on this basis.

Ms. Chapel is also entitled to summary judgment on Mr. Miszler's claim that she prevented him from receiving his prescription medications.  Mr. Miszler has not presented any competent evidence of Ms. Chapel's direct participation in, or even knowledge of, the denial of his prescription medications.  On August 27, Ms. Chapel advised Mrs. Miszler not to fill her husband's prescriptions prior to returning to SCCF because he would not be allowed to bring the medications into the prison.  Ms. Chapel further advised Mrs. Miszler to bring the prescriptions to SCCF, where they would be filled by an SCCF employee.  This evidence is insufficient to support an inference that Ms. Chapel was deliberately indifferent to Mr. Miszler's serious medical needs.  Her actions did not deny Mr. Miszler access to his medication.  Furthermore, Ms. Chapel, was not present when Mr. Miszler arrived at SCCF and, unlike Warden Brennan, she did not assume responsibility to ensure that Mr. Miszler received his prescription medications.  To defeat Ms. Chapel's summary judgment motion, Mr. Miszler "must point to some evidence beyond [his] raw claim that [Ms. Chapel] was deliberately indifferent."  Because he has not sustained his burden, summary judgment will be granted.

### 3) Mr. Shoemaker

Mr. Shoemaker, Chief Probation Officer for Susquehanna County, argues that he is entitled to summary judgment because there is no evidence of his involvement in the alleged

---

time of the relevant events, the Order sheds light on Ms. Chapel's thinking at the time she directed Mr. Miszler's return to SCCF.

constitutional violations.  (Defs.' Supp. Br. 6.)  For an individual to be liable in a § 1983 action, the plaintiff must establish that the individual personally directed the constitutional violation, knew of the violation and acquiesced in its commission, or affirmatively promulgated a policy that caused the constitutional violation.  See Rode, 845 F.2d at 1207; Mabine, 25 F. Supp. 2d at 592.  Here, there is no evidence in the record that Mr. Shoemaker was personally involved in the denial of Mr. Miszler's prescription medications, that he knew others were refusing to administer the prescription medications, or that he personally promulgated a policy that caused the harm to Mr. Miszler.

In an effort to salvage his claim against Mr. Shoemaker, Mr. Miszler argues that Mr. Shoemaker was directly involved because he had knowledge of SCCF's polices and was charged with executing these policies.  (Pl.'s Opp'n Br. 18-20.)  This argument is without merit. Regardless of whether these "policies" are actionable in a § 1983 action, there is no evidence that Mr. Shoemaker had knowledge of any of SCCF's policies.  Nor is there evidence explaining why Mr. Shoemaker, the county's Chief Probation Officer, would be responsible for carrying out SCCF's policies.  In short, these unsubstantiated contentions advanced by Mr. Miszler's attorney are insufficient to defeat summary judgment.  Therefore, Mr. Shoemaker is entitled to summary judgment.

### 4) The Board Members

Mr. Miszler has sued the Board Members in their individual capacities, alleging that they

created the conditions facilitating the infringement of his constitutional rights.  Specifically, Mr. Miszler argues that the Board Members established a policy that inmates could not receive injection medications while incarcerated at SCCF; established the policy precluding prisoners from bringing prescription medications into SCCF; and failed to provide for the prompt delivery of prescription medications.

The Board Members can be liable in their individual capacities for affirmatively promulgating a policy that causes the constitutional violations, but, of course, there must be competent evidence of the Board Member's actions.  See Mabine, 25 F. Supp. 2d at 592. Here, there is no evidence that the Board Members were personally involved in promulgating these policies, nor is there evidence that they promoted these policies.  Cf. Ingalls v. Florio, 968 F. Supp. 193, 197 (D.N.J. 1997) (denying summary judgment where plaintiffs adduced evidence that defendants knew of conditions at prison and promoted the policies causing the conditions).  Moreover, Mr. Miszler does not allege that the Board Members participated in, or had knowledge of, the denial of his prescription medications.  Accordingly, the Board Members, in their individual capacities, are entitled to summary judgment.

### C. Municipal Liability

Finally, Mr. Miszler has sued Susquehanna County, as well as the Board Members in their official capacities, which is effectively a claim against the Prison Board.[10]  Municipalities

---

[10]See Nelson v. Walsh, 60 F. Supp. 2d 308, 313 n.5 (D. Del. 1999) ("Suing a government official in his or her official capacity is equivalent to suing the government entity

and government agencies are not vicariously liable for the constitutional transgressions of their employees.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Rather, the plaintiff must demonstrate that a deprivation of his constitutional rights was "caused by either a policy or custom of the municipality."  Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000).  A "[p]olicy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict."  Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990)).  A custom is a practice of state officials "'so permanent and well settled' as to virtually constitute law."  Id. (quoting Andrews, 895 F.2d at 1480).

Once the plaintiff identifies the relevant policy or custom, "he must 'demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'"  Berg, 219 F.3d at 276 (quoting Bd. of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997)).  In other words, the plaintiff must show that the employee's execution of a municipality's policy or custom caused the injury.  King v. Timmoney, No. Civ. A. 02-669, 2003 WL 22436228, at *3 (E.D. Pa. Oct. 24, 2003) (quoting Monell, 436 U.S. at 694); see also Kneipp, 95 F.3d at 1213 (requiring a "plausible nexus" or "causal link" between government policy or custom and particular violation); Platt v. Plymouth Twp., No. Civ. A. 99-372, 2000 WL

---

itself." (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978))); see also Meyers v. Schuylkill County Prison, No. 4:CV-04-1123, 2006 WL 559467, at *9 (M.D. Pa. Mar. 7, 2006) (holding that a county prison board is a local government unit and a "person" amenable to suit under § 1983).

1272661, at *5 (E.D. Pa. Aug. 25, 2000) ("A complaint of injury must be causally linked to a custom or policy of the municipality under § 1983 in which an employee was acting.").  This causation element is essential to prevent the imposition of liability against a municipality solely because of its status as the employer of the transgressor. See Izquierdo v. Sills, 68 F. Supp. 2d 392, 406-07 (D. Del. 1999).

In this matter, Mr. Miszler has not identified any policy or custom attributable to Susquehanna County.  Therefore, summary judgment will be granted to Susquehanna County.  As to the Prison Board,[11] Mr. Miszler asserts that it promulgated a policy that precluded prisoners from receiving injection medication.[12]  In this regard, Corrections Officer Barron testified that SCCF employees are not permitted to administer such medications because they are not qualified to do so.  Furthermore, unless the prisoner is capable of self-injecting his medication, such as a diabetic, he will not receive any medications that are administered by injection.

---

[11]Defendants concede that the Prison Board promulgates policy for SCCF.  (Answer, Dkt. Entry 3, ¶¶ 5-9.)

[12]Mr. Miszler also refers to SCCF's prohibition against prisoners bringing prescription medications into SCCF, as well as SCCF's contract with Diamond.  Mr. Miszler complains that these "policies or customs" prevent the prompt delivery of prescription medications.  To the extent this is an actual policy or custom, there is no evidence that Warden Brennan was implementing this policy by denying Mr. Miszler his prescription medications.  Moreover, these policies are irrelevant to Mr. Miszler's claims because Corrections Officer Barron testified, uncontradicted, that SCCF had medications onsite in its pharmaceutical stock room, including Cephalexin, and that the prescription for Percocet was filled at a nearby pharmacy.

Corrections Officer Barron's testimony is sufficient to establish the existence of an SCCF policy.  See Natale, 318 F.3d at 583, 584-85.  Additionally, because one of the prescription forms given to Warden Brennan was for Lovenox – an injection medication – and Lovenox was not administered to Mr. Miszler, it can be inferred that Warden Brennan's actions were, in part, induced by the policy.  See id. at 584 (employee's actions result from policy when "'the subsequent act complained of is simply an implementation of that policy'." (quoting Brown, 520 U.S. at 417 (Souter, J., dissenting))).  However, these facts are immaterial because there is no evidence that this policy was the "proximate cause" of any injury.  Kneipp, 95 F.3d at 1213.

In Natale, plaintiff presented evidence that defendant did not have a policy in place to address the immediate medical needs of prisoners upon their arrival at the prison.  Natale, 318 F.3d at 585.  Though prisoners were seen by a doctor within seventy-two hours of their arrival, there was no process in place to accommodate prisoners with urgent medical needs, such as an "insulin-dependent diabetic."  Id. at 582-83.  The court concluded that a reasonable jury could "infer that the failure to establish a more responsive policy caused the specific constitutional violation of which the [plaintiffs] complain, i.e., the failure to administer insulin to [plaintiff] in a timely fashion[, which led to plaintiff's stroke two days later]."  Id. at 585.

Here, the failure to administer the Lovenox to Mr. Miszler did not cause his claimed injury.  Rather, it was the failure to administer Cephalexin, an antibiotic, while he was confined at SCCF that caused a deep wound injection, resulting in surgery, permanent disability, and

disfigurement.  Dr. Metzger, Mr. Miszler's expert, opined that the "withholding [of] these antibiotics could certainly have been deleterious to his wound"; "the appropriate administration of antibiotics in [SCCF] would have minimized the likelihood of a deep wound infection developing."  (Metzger Report, at 2.)  The only antibiotic prescribed by Dr. Chiavacci – and withheld from Mr. Miszler – was Cephalexin.  Dr. Metzger's report does not even mention Lovenox, and with good reason, since Lovenox is an anticoagulant intended to prevent blood clots, not an antibiotic administered to guard against infection.[13]  Thus, Mr. Miszler cannot establish causation because, even if SCCF had a policy that enabled prisoners to receive injection medications, and Mr. Miszler received the Lovenox, his injury would not have been avoided.  See Platt, 2000 WL 1272661, at *5.  To the contrary, it was the failure to administer Cephalexin, unrelated to the injection medication policy, that harmed Mr. Miszler.  Accordingly, because Mr. Miszler cannot connect his injury to an alleged policy or custom promulgated by the Prison Board, the Board Members, in their official capacity, are entitled to summary judgment.[14]

## III. CONCLUSION

For the reason stated, Defendants' motion for summary judgment will be granted in part

---

[13]See Lovenox, http://www.drugs.com/mtm/lovenox.html (last visited June 1, 2007).

[14]Because the municipal defendants cannot be held liable, summary judgment will also be granted to the remaining individual Defendants – Warden Brennan, Ms. Chapel, and Mr. Shoemaker – to the extent Mr. Miszler has sued them in their official capacity.  See Izquierdo v. Sills, 68 F. Supp. 2d 392, 404 (D. Del. 1999).

and denied in part.  An appropriate Order follows.

<u>**s/ Thomas I. Vanaskie**</u>
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BERNARD VICTOR MISZLER,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **3:04-CV-1756** |
| | : | **(JUDGE VANASKIE)** |
| **JEFFREY SHOEMAKER, ET AL.** | : | |
| **Defendants** | : | |

<u>**ORDER**</u>

**NOW, THIS 4th DAY OF JUNE, 2007,** for the reasons stated in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Dkt. Entry 13) is **GRANTED IN PART**

**AND DENIED IN PART** as follows:

a) Summary Judgment is **GRANTED** as to Plaintiff's claims against Jeffrey J.

Shoemaker, Sheri Chapel, Charles J. Aliano, Lance Benedict, Robert Calvin Dean, Gary

Marcho, and Lee Smith in their individual and official capacities.  Judgment shall be entered

in favor of Defendants Shoemaker, Chapel, Aliano, Benedict, Dean, Marcho, and Smith,

and against Plaintiff.

b) Defendant Susquehanna County's Motion for Summary Judgment is **GRANTED.**

Judgment shall be entered in favor of Susquehanna County and against Plaintiff.

c) Defendant William Brennan's Motion for Summary Judgment as to Plaintiff's claim

against him in his official capacity is **GRANTED.**  Judgment shall be entered in favor of

William Brennan, in his official capacity, and against Plaintiff.

d) In all other respects, the Motion for Summary Judgment is **DENIED.**

2. A telephonic scheduling conference will be conducted on **June 22, 2007, at 10:00 a.m.**  Attorney Bruce J. Phillips is responsible for placing the call to **570-207-5720**, and all parties shall be ready to proceed before the undersigned is contacted.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

2